E-FILED
Monday, 14 August, 2006  04:05:48 PM
Clerk, U.S. District Court, ILCD

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
## URBANA DIVISION

---

| | | |
|---|---|---|
| **CASEY K., by NORMAN and MARI K.,** | ) | |
| **Individually and as his Parents and Next** | ) | |
| **Friends,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 04-2128** |
| | ) | |
| **ST. ANNE COMMUNITY HIGH SCHOOL** | ) | |
| **DISTRICT NO. 302 and ILLINOIS STATE** | ) | |
| **BOARD OF EDUCATION,** | ) | |
| | ) | |
| **Defendants.** | ) | |

---

## OPINION

---

Plaintiffs brought this action under the Individuals with Disabilities in Education Act (IDEA), 20 U.S.C. § 1401 *et seq.*, against Defendants St. Anne Community High School District No. 302 (District) and the Illinois State Board of Education (ISBE).  The parties have both filed motions for summary judgment.  For the reasons that follow, Defendant District's Motion for Summary Judgment (#92) is GRANTED and Plaintiffs' Motion for Summary Judgment (#98) is DENIED.

### PROCEDURAL BACKGROUND

Plaintiff Casey K. is eligible for special education services.  During Casey's eighth grade year, his parents placed him in the Acacia Academy, a private school, because they did not believe the St. Anne Elementary School could provide him with the educational services he was entitled to under the IDEA.  Plaintiffs then sought a due process hearing under the IDEA in an effort to make

the elementary school district pay for the private school placement.  The parties settled the dispute on March 4, 2004, and agreed that Casey could stay at Acacia at the expense of the elementary school district until May 12, 2004, when Casey would reach the age of 15 and become the responsibility of the high school.  This agreement was incorporated into an Individualized Education Plan (IEP) on March 25, 2004.

When Casey turned 15, the District issued a new IEP for him as it was entitled to do because it is a separate school district from the elementary school.  The IEP found that Casey could be educated at the local high school.  Plaintiffs challenged the new IEP and again sought a due process hearing under the IDEA.  Pursuant to 20 U.S.C. § 1415(j), Plaintiffs also invoked the IDEA's stay put provision to allow Casey to remain at Acacia during the pendency of the proceedings.  Both parties filed motions for temporary restraining order seeking a determination as to the appropriate placement for Casey pending resolution of administrative and judicial proceedings.  On August 13, 2004, Judge Joe Billy McDade entered an order (#11) finding that Acacia was the appropriate stay put placement pursuant to § 1415(j) of the IDEA.  The District appealed this decision.

Subsequently, on October 19, 2004, following the due process hearing requested by Plaintiffs, Dr. Marie Bracki, an Impartial Hearing Officer (IHO), determined that Casey's appropriate educational placement was in the District, thus changing Casey's educational placement from Acacia School.  On January 8, 2005, Plaintiffs filed an Amended Complaint (#22) seeking to overturn the IHO's decision.  Plaintiffs then filed a motion for temporary restraining order (#33) to enforce the stay put order issued by Judge McDade which requires placement of Casey at Acacia at public expense during the pendency of this matter.  This court granted the motion for temporary

restraining order on February 17, 2005.[1]  No appeal was taken from this order.  Subsequently, the Seventh Circuit Court of Appeals affirmed Judge McDade's determination that Acacia was the appropriate stay put placement.  See Casey K. v. St. Anne Comm. High Sch. Dist. No. 302, 400 F.3d 508 (7th Cir. 2005).  Thus, Casey has remained at Acacia during the pendency of these proceedings. This matter is now before the court on review of the decision of the IHO finding the District to be the appropriate placement for Casey.

## FACTS

Casey lives with his parents Norman and Mari in St. Anne, Illinois, within the boundaries of the District.  Casey, now sixteen years of age, has dyslexia, dysgraphia, memory deficits, and other learning disabilities.  In May 2003, Cindy Lee, Casey's private behavior therapist, found that Casey was experiencing serious anger and anxiety problems as a result of his lack of progress in learning to read at St. Anne Grade School.  This situation lead to Casey making a verbal threat to blow up the St. Anne Grade School while attending there.  During 2003, Casey's parents also had him tested by Dr. Rudy Lorber who determined that Casey was dyslexic, severely learning disabled, and required specialized reading instruction.  Dr. Lorber further determined that Casey's academic, cognitive, and linguistic challenges affected his self esteem.  On the first day of school for Casey's eighth grade year, Mari took Casey to the grade school, but he would not get out of the car.  As a result, Casey's parents placed him at Acacia for his eighth grade year.[2]  Casey's emotional state and overall demeanor improved after progressing in his reading ability at Acacia.

---

[1]  Count I of Plaintiffs' complaint seeks the relief which this court granted in February 2005, a stay put placement for Casey at Acacia.

[2]  Casey has been attending Acacia since September 11, 2003.

Acacia is located approximately 66 miles from St. Anne in LeGrange, Illinois.[3]  Acacia is a private, therapeutic day school focusing on education for children with learning disabilities for grades K-12.  At Acacia, Casey is instructed using the Wilson Reading Program, Lindamood-Bell, and Great Leaps methodologies.  Under the Wilson Reading Program, a student starts at level one regardless of the student's reading level at the time the program is started.  The program has twelve levels.  The Wilson Reading Program focuses on spelling and decoding, or understanding the phonemes that make up words.  Great Leaps is a program that works with reading fluency.

In September 2003 and again in February 2004, Casey was administered the Woodcock-Johnson III Achievement Tests at Acacia.  The subtest results for the September 2003 test were as follows: (1) Spelling: Percentile - 1; RPI - 4/90; (2) Spelling of Sounds: Percentile - 35; RPI - 84/90; (3) Reading Fluency: Percentile - 2; RPI - 0/90.[4]  The subtest results of the February 2004 test were as follows: (1) Spelling: Percentile - 1; RPI - 5/90; (2) Spelling of Sounds: Percentile - 32; RPI - 82/90; (3) Reading Fluency: Percentile - 2; RPI - 0/90.  Kathy Foucks, the principal of Acacia, testified that Casey should have theoretically scored much higher in February 2004 than when he started in September 2003.  A letter from Acacia dated March 25, 2006, indicates Casey's overall reading comprehension scores improved from a 2.3 grade level to a 4.6 grade level as result of the Wilson Reading System.

---

[3]  Mari testified that her travel time to Acacia was 1.5 hours each way.  Casey told Dr. Lorber he would like to return home from school earlier because it is too dark to play with his peers when he gets home.  Casey also said he does not see his Acacia classmates outside of school because they live too far away.  Casey's mother testified that the drive gives Casey some needed down-time before and after school.

[4]  RPI is the relative proficiency index, a comparison to an age appropriate score.  For example, a score of 90/90 is age appropriate.

The District developed a proposed IEP for Casey on May 17, 2004. Prior to the IEP meeting, the Parents did not know all of the specifics regarding the programs proposed by the District and asked for an explanation of them. Prior to the IEP meeting, Mari met with Dr. Harris, then superintendent of the District. Mari provided Dr. Harris with a copy of the psychoeducational report of Dr. Lorber. Mari also called Sonnia Sovino, the District's guidance counselor, to insure no additional information was needed for the IEP meeting. The District never requested additional information prior to the IEP meeting.

The IEP contained goals and objectives in the areas of reading fluency and understanding, reading comprehension, math, organization, written expression, handwriting, visual motor skills, and receptive/expressive language skills. The goals were the same as those used by Acacia, but did not include those goals already met by Casey. The Parents did not object to the goals. The IEP set forth a self-contained special education placement for Casey with direct services in a special education classroom in reading, language arts, mathematics, social studies, science, and study hall, resulting in 89% of Casey's day being spent in a special education setting. Tricia Downs is the District's reading and language arts teacher. Downs received training in the Read 180 Program proposed by the District. Downs testified that the special education reading and language arts classes had between 4 and 13 students and had a full time instructional aide. The grade levels in Downs' classes ranged from Kindergarten to 6th grade. In September 2004, Casey was reading at a 5th grade level. Jeanne Harroun was to serve as Casey's social studies teacher in the District. Harroun is special education certified. Harroun testified before the IHO that her special education classes had between four and fourteen students and employed the use of a full time instructional aide. Harroun further testified she used one-to-one or small group instruction to meet the needs of students like Casey.

The math teacher under Casey's IEP was to be Bill Haveneer, who testified to teaching three special education classes with between 7 and 11 students. Each class also had an instructional aide. Havener further testified he could provide one-to-one assistance to Casey during his study hall period. The IEP proposed by the District further provided for 50 minutes per week of direct speech/language services, 15 minutes per week of indirect speech/language services, and 30 minutes per week of occupational therapy. Acacia offered 10 to 15 minutes per week of direct speech/ language services and ten minutes per week of occupational therapy. Dr. Rudy Lorber, retained by Casey's parents, testified that Casey should have more than 15 minutes per week of speech and language services.

At the IEP meeting, the District also proposed the Read 180 program for Casey. The District informed Casey's parents at the IEP meeting it would obtain more information for them regarding the program because it did not have written materials available at that time. The Read 180 program is designed to use small-group instruction, computer-assisted instruction, and individualized instruction for each student. Sharalyn Bone, a Read 180 teacher in a different school district, testified before the IHO that she trained St. Anne High School teachers in the Read 180 program. Bone testified she took the teachers through the procedures she would use in a normal day of teaching the Read 180 program. The training consisted of one 7.5 hour day and two other shorter visits to set up the computer system and make sure the teachers had the supplies they needed. Bone testified she could not "say enough good things about" the Read 180 program. Nancy Palmer, an assessment specialist for the Des Moines Independent Community School District testified regarding the Read 180 program that "some students did well with it, and some didn't do as well, but on the whole, we were seeing good scores." Documentation submitted by the District to the IHO indicated

-6-

that a study of students at a North Carolina school and a Nevada school demonstrated improvement in students with learning disabilities through use of the Read 180 program. The Read 180 Program Guide sets forth a "90 Minute Instructional Model," stating that students should be taught for 90 minutes a day for five days each week for "best results." The IEP developed by the District stated that Casey would only have Read 180 for 250 minutes per week or 50 minutes per day.

The IEP further required extended school year services (ESY) for Casey, and the District offered Casey the 20th Century program to begin on May 24, 2004.[5] The 20th Century program offered general curricular instruction, plus social and cultural enrichment activities. The purpose of the program is to "provide expanded academic enrichment opportunities for children attending low performing schools." This program focused on language arts and math with experienced based activities, and offered a literary approach including vocabulary, comprehension and fluency. The District indicated related services consisting of 50 minutes per week of speech/language therapy and 30 minutes per week of occupational therapy could be offered on the fifth day of each week when the 20th Century program was not being used. Casey did not participate in the 20th Century program. Casey's parents rejected the IEP proposed by the District and requested a due process hearing within three hours of the IEP meeting.

Jean Kulczyk, who holds a master's degree in education and has experience in teaching children with disabilities, reviewed the public relations kit for the Read 180 program. Kulczyk found the Read 180 program the District planned to implement was not individualized for Casey,

_____

[5] The March 25, 2004, IEP developed as a result of a settlement between Casey and the St. Anne Grade School has a checked box indicating the IEP team decided Casey needed ESY at Acacia as an essential component for a free appropriate public education (FAPE). This determination was made based upon an Acacia Academy evaluation of Casey indicating his emerging skills in reading and writing.

was non-responsive to Casey's deficit in creative writings skills, was likely to frustrate Casey, and targets a less disabled population than Casey. Kulczyk also found that a portion of the students in studies of the Read 180 program did not progress and asserted this portion of students was likely the more severely learning disabled students. Kulczyk further determined the 21st Century Program was deficient for Casey. Kulczyk also found that Casey made substantial improvement in reading as a result of the Wilson Reading Program employed by Acacia, finding that Casey made two years of progress in reading. Kulczyk stated the Wilson program was targeted to severely disabled children like Casey and is designed to be individualized by teachers for students. Her report was presented at the due process hearing.

Following the hearing, the IHO determined that the District's IEP was appropriate and ordered Casey be transferred from Acacia to the District at the end of the semester. In her decision, the IHO indicated that the "transportation issue [between St. Anne and Acacia] presents significant concern." The decision further stated:

> Testimony was given by professionals familiar with the reading program that was proposed to be used in the student's education, the Read 180 Program. The reading program is being researched, is being implemented in districts all over the country, and utilizes direct instruction, computer-assisted instruction, and feedback geared specifically to each student. Evidence was presented and testimony given regarding the results of various research reports. Success was reported in the Des Moines school system, North Carolina, and Clark County in Nevada. The success was reported for regular students and for learning disabled students as well. Since the May 17, 2004, IEP meeting, teachers have received training on the program and

materials are available in the district.  The parent's argument was that at the IEP

meeting no information was available, therefore, the program was not appropriate.

The District subsequently provided information to the parent.

The IHO also rejected Casey's argument that the District should employ the methods used by

Acacia, finding the Read 180 program proposed by the District is "calculated to provide educational

benefit" to Casey.

Casey continued to attend Acacia pursuant to the stay put order issued by this court.  At the

beginning of his ninth grade year, objective testing showed him to be at a word recognition

instructional level of mid-third grade in reading and very low in processing speed, reading

comprehension, math calculation skills, basic writing skills, and written expression, as well as

having very limited cognitive fluency.  In September 2004, Trudi Reiser, a certified audiologist and

speech language therapist, tested Casey and found him to have significant auditory processing

deficits.

On December 13, 2005, Casey's designated expert, Jean Kulczyk, observed Casey at

Acacia.[6]  During Casey's first period social studies class, Kulczyk did not observe any specific

methodology being used.  Casey's second class was math.  Kulczyk observed Casey eating Cheetos,

yogurt, and applesauce during class.  Casey did not get permission to eat this food, and his teacher

did not comment on it.  Also in math class, Casey and another student discussed a peer snoring on

the bus.  Casey's teacher made a snoring noise, eliciting laughter from the class.  However, the

---

[6] This court allowed the parties to take additional evidence outside of the administrative
record on motion of Plaintiffs.  The additional evidence allowed consisted of evidence supplied
by experts as to the suitability of the programs proposed by the District for Casey and evidence
regarding Casey's progress at Acacia.

teacher did not reprimand Casey or his friend.  In geography class, Casey was directed to color a blank map and label the map with the names of appropriate countries and bodies of water.  Casey began singing instead of completing the assignment.  When the teacher attempted to get Casey on task, Casey stated he did not use colored markers.  Casey then continued to sing.  Also during the class, a teacher sat next to Casey in an attempt to get him to complete the map.  Casey moved away and said he would return to his desk when the teacher moved.  Kulczyk found Casey's behavior inappropriate, but there was no consequence for Casey's actions.  Kulczyk continued to observe Casey engaged in off-topic behavior, including singing, rapping the table with his knuckles, eating, and talking with another student.  Kulczyk indicated that staff at Acacia "appeared to ignore the singing behavior all day."  Kulczyk was also concerned by Casey's frequent restroom visits, asserting it may be avoidance behavior.  Kulczyk believed the map project should have been modified for Casey because of his difficulty with handwriting, and speculated that Casey expressed his frustration as defiance.  In Casey's English class, his teacher told Kulczyk that Casey "had changed a lot since last year" in that he had been more pleasant previously.  Kulczyk further indicated the teacher thought Casey was  "having problems being more defiant, being off task."  Kulczyk believed that Casey had made gains in fluency and was reading at a 7th grade instructional level.[7]

The District retained Dr. Richard Van Acker as its expert.  Van Acker has been a professor at the College of Education at the University of Illinois in Chicago since 1987.  He was the Special Education Area Chairperson from 1994 to 1998.  Van Acker conducted an observation of St. Anne Community High School with Casey's expert, Dr. Rudy Lorber, on February 2, 2006.  Dr. Lorber

---

[7]  Kulczyk never observed the Read 180 program or the 21st Century program.

has extensive training and experience as a pediatric neuropsychologist and has national board certifications in behavioral psychology and school psychology.

Van Acker submitted a report based upon his observations.  In his report, Van Acker stated as follows regarding the Read 180 program: "The reading class was very orderly and the students appeared interested and demonstrated outstanding levels of task engagement. . . . Obviously, Mr. Sherer has clear expectations and the students appear to respond well to the Read 180 Program and Mr. Sherer as a teacher."[8]  Van Acker then observed the English class taught by Ms. Downs, noting in his report that "[a]ctive task engagement was again very high."  Regarding the science class, Van Acker indicated there were four students taught by a teacher, Ms. Hochhalter, and a teacher's aide.  Van Acker indicated that Hochhalter provided more basic questions to the more low functioning student and worked with him one-on-one more frequently.  Van Acker stated in his report that there was "excellent involvement" in the class and "the level of correct responding averaged 81%."  The final class observed was mathematics which contained nine students and was taught by the same teacher and aide as the science class.  Van Acker stated the "[t]ask engagement in this class was surprisingly high given the number of students and the different levels of instruction being delivered" and the "average level of correct responding was 85%."  Overall, Van Acker concluded as follows with regard to his evaluation of the District's program:

> A review of the IEP goals, benchmarks, related services, and accommodations does not suggest the problem calls for placement within a private therapeutic day program. The instructional program at St. Anne High School would be more than sufficient to

---

[8] Sherer is not a special education teacher.  However, he is a reading specialist and trained in the Read 180 program.

provide [Casey] a free appropriate public education (FAPE).  Indeed, the special

education classrooms at St. Anne High School provide a better teacher:pupil ratio

and more intensive instruction than that reported at Acacia Academy.  Casey can

continue to get intensive special education and related services while also allowing

him to attend school within his home high school program with typically developing

peers.  The level of academic engagement displayed by the students in the special

education classes observed as part of this report was quite impressive.  Instructional

strategies and instructional programs in use at St. Anne High School are empirically

validated and scientifically-based interventions.  Read 180, for example, has been

shown to be an effective multisensory program for students with learning disabilities.

St. Anne High School has a diverse student population and appears to understand the

challenge of providing an orderly, safe and successful school experience for all of

their students.  I strongly recommend that Casey be returned to the St. Anne High

School program for the remainder of his high school years.

Van Acker did also indicate the Wilson Reading program is an appropriate program for Casey.

Dr. Lorber, who conducted his evaluation of St. Anne at the same time as Van Acker, also

submitted a report and provided deposition testimony regarding his opinions of the program.  In

reviewing in-house documentation and promotional material for the Read 180 program, Lorber

observed there was no difference between students who had been administered the Read 180

program for one year and a non-treated control group in reading skill.  Lorber further indicated the

Read 180 documentation does not indicate how it compares to any other reading program, like the

Wilson Reading program.  Lorber indicated he talked with Mr. Sherer, the reading teacher, and

asked what he would do if a student was having trouble with the program material. Sherer indicated he would take the student down a level and would continue to do so until he was successful in using it. Lorber further asked Sherer if he had any knowledge of empirically-derived multi-sensory phonics instruction programs, and Sherer indicated he did not.

Dr. Lorber evaluated Casey's performance on several academic tests in both 2003 and 2005, including the Comprehensive Test of Phonological Process (CTOPP), Test of Problem Solving (TOPS), Clinical Evaluation of Language Fundamentals (CELF), Test of Language Competence (TLC); Test of Written Language (TOWL); and Woodcock-Johnson Tests of Achievement Third Edition (WJS-III).[9] In addition to straight comparisons of the test results between the two dates, Dr. Lorber analyzed the data according to whether there was year-for-year progress. Lorber testified that between the two testings, Casey made progress and year-for-year gains, but had not bettered his overall performance. A comparison chart made by Lorber indicates there were nineteen subtests with greater than year-for-year gains, twenty-two subtests with year-for-year progress, and seven with less than year-for-year progress. Lorber further testified Casey is a stepwise learner, meaning he will not show a month's progress for every month of instruction, and needs to "continue with intensive intervention to improve his skills."

Following his observation of the programs at the District, Lorber reached the following conclusions:

---

[9] CTOPP assesses the three empirically derived components of phonological processing skills. TOPS assesses verbally based problem solving skills in a variety of real life situations. CELF assesses receptive language skills. TLC is used to assess higher level receptive language skills. TORC evaluates reading comprehension skills, and TOWL assesses formulated creative written language skills. Casey was administered portions of WJS-III to assess his phonetic decoding/word attack skills, encoding skills, and sight word recognition skills in isolation and as one component of his reading comprehension skills.

1. Casey has benefited from his current educational placement as evidenced in both the improving aspects of his processing skills as well as making year-for-year progress in other areas.  Although expectedly slow given a stepwise learning process these benefits have resulted in functional educational gains.

2.  The predetermined schedule of observation of the Saint Anne High School program revealed personable teachers and aides who appear well liked by their students.  However, the "one size fits all" model observed in two of the academic classes (i.e., English and Science) are by their very nature totally inappropriate for Casey.    Further, in the critical area of decoding/encoding and reading comprehension, no apparent coordination of instructional methodology (i.e., consistency of instruction) was observed.  These numerous inconsistent presentations as well would be inappropriate to meet Casey's educational needs.  Observation also revealed countless missed opportunities for individualized strategic intervention.  For example, when novel words are misread, application of the concurrently taught decoding strategies should have been employed to aid in reading accuracy.

3.  Given that computer algorithms are no substitution for human decision making, and that no computer is able to evaluate the human decision process that goes into each correct and incorrect response, the "Read 180" computer program is inappropriate to meet Casey's unique educational needs.  This is true both at the level of provision of an appropriate individualized educational model, but also at the level of providing Casey with consistent immediate feedback regarding the correct or incorrect application of remedial strategies and procedures (e.g., CVC words).

-14-

4.  Finally, given Casey's age and the profound nature of Casey's functional skills, subjecting him to an unknown program given the described inadequacies is tantamount to subjecting him to a "single subject experiment."  This is educationally unsound and thus inappropriate.  Therefore, Casey should remain in his current placement with provision of related services as determined by the Individualized Education Program.

ANALYSIS

Both parties have filed motions for summary judgment, but a summary judgment motion in the context of an IDEA case has a different meaning than in typical cases.  Alex R. v. Forrestville Valley Cmty. Unit Sch. Dist. #221, 375 F.3d 603, 611 (7th Cir. 2004).   The motion may be more aptly described as a "motion for judgment under the IDEA."  Alex R., 375 F.3d at 611.  In the instant matter, the parents bear the burden of proof as the party challenging the outcome of the administrative proceeding.  Alex R., 375 F.3d at 611.  The IDEA states that in determining whether this burden has been met, the court "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate."  20 U.S.C. § 1415(i)(2)(C).  While a hearing officer is entitled to no deference on issues of law, this court is required to give "due weight" to the decision of the hearing officer on issues of fact.  Alex R., 375 F.3d at 611-12.  However, the meaning of "due weight" varies depending on whether the court hears evidence outside the administrative record.  "The more that the district court relies on new evidence . . . the less it should defer to the administrative decision: '[j]udicial review is more searching the greater the amount (weighted by significance) of the evidence that the court has but

-15-

the agency did not have.'"  Alex R., 375 F.3d at 612, quoting School Dist. of Wis. Dells v. Z.S., 295 F.3d 671, 675 (7th Cir. 2002).  "Thus, at the opposite extreme from cases in which the district court hears no new evidence, the administrative decision is relatively less important and the district court effectively acts as the factfinder."  Alex R., 375 F.3d at 612.  "In such circumstances, although the administrative record is still part of the case and the district court therefore must not go so far as to conduct a trial de novo, less weight is due the administrative record."  Alex R., 375 F.3d at 612 (citation omitted).[10]

Under the IDEA, a disabled child is entitled to a free appropriate public education (FAPE). 20 U.S.C. § 1400(d).  "A free appropriate public education is one specially designed to meet the unique needs of the handicapped child, supported by services as are necessary to permit the child to benefit from the instruction."  Board of Educ. of Murphysboro Comm. Unit Sch. Dist. No. 186 v. G.S., 41 F.3d 1162, 1166 (7th Cir. 1994).  In order to provide FAPE, the District must (1) follow the procedures set forth in the IDEA and (2) "develop an IEP through those procedures that is reasonably calculated to enable the child to receive educational benefits."  Murphysboro, 41 F.3d at 1166.  "Once the school district has met these two requirements, the courts cannot require more; the purpose of the IDEA is to open the door of public education to handicapped children, not to educate a handicapped child to his highest potential."  Murphysboro, 41 F.3d at 1166.

The Parents first argue that the IEP proposed by the District did not provide FAPE to Casey. The goals and objectives set forth in the IEP included the areas of reading fluency and

_____

[10]  The Parents make a number of arguments regarding whether Casey had a fair due process hearing.  Primarily, the Parents argue the IHO erred in denying discovery.  However, the court finds that any error in denying discovery to the Parents has been remedied by this court allowing the parties to submit additional evidence to this court.

understanding, reading comprehension, math, organization, written expression, handwriting, visual

motor skills, and receptive/expressive language skills.  The goals included in the IEP were the same

goals which had been implemented by Acacia, excluding those goals already met by Casey, and the

Parents did not object to these goals.[11]  The IEP indicated Casey would spend 89% of his day in a

special education setting, receiving direct services in reading, language arts, mathematics, social

studies, science, and study hall.  Related services would also be offered in speech/language and

occupational therapy.  Testimony received at the due process hearing from those who would be

teaching Casey indicated the manner in which Casey could be incorporated into the classes.[12]

   The Parents' primary contention with the IEP pertains to the reading program and ESY

services proposed by the District.  The Parents assert the Wilson Reading Program implemented at

Acacia is the more appropriate reading program for Casey, as opposed to the Read 180 program

proposed by the District.  As a general rule, "once a court determines that the requirements of the

Act have been met, questions of methodology are for resolution by the State."  Lachman v. Illinois

---

[11]  The Parents assert that the IEP proposed by the District was not adequate because the
District did not recognize Casey has having a "severe" learning disability.  However, the IEP
adopted the same goals as Acacia which the Parents assert understood the extent of Casey's
disability.  Furthermore, the "IDEA charges the school with developing an appropriate
education, not coming up with a proper label with which to describe [a student's] disabilities.
Heather S. v. State of Wis., 125 F.3d 1045, 1055 (7th Cir. 1997).

[12]  The Parents argue the IEP was inappropriate because they did not receive sufficient
information regarding the Read 180 program at the time of the IEP meeting.  In support of this
argument, the Parents cite T.H. v. Board of Educ. of Palatine Cmty. Consol. Sch. Dist. 15, 55 F.
Supp. 2d 830 (N.D. Ill. 1999).  While the court in T.H. did determine the proposed placement
was inappropriate due, in part, to a lack of individualization for the student, the case does not
stand for the proposition that an IEP necessarily fails if parents do not have all of the information
they want about a proposed program.   The Parents have failed to cite a case indicating that
failure to specify the specific classroom or how the classroom will be set up to the Parents prior
to an IEP meeting is a violation of the IDEA.

State Bd. of Educ., 852 F.2d 290, 294 (7th Cir. 1988), quoting Board of Educ. of the Hendrick

Hudson Cent. Sch. Dist. v. Rowley, 458 U.S. 176, 208 (1982).  The IDEA provides that "[t]he

primary responsibility for formulating the education to be accorded a handicapped child, and for

choosing the educational method most suitable to the child's needs" is left to "state and local

educational agencies in cooperation with the parents or guardians of the child." Lachman, 852 F.2d

at 296.

 There is sufficient support in the record before this court that the teaching programs proposed

by the District and approved by the IHO satisfy the substantive requirements of the IDEA.  The

Read 180 program is designed to use small-group instruction, computer-assisted instruction, and

individualized instruction for each student.  Sharalyn Bone, a Read 180 teacher in a different school

district, testified she could not "say enough good things about" the Read 180 program.  Nancy

Palmer, an assessment specialist for the Des Moines Independent Community School District

testified regarding the Read 180 program that "some students did well with it, and some didn't do

as well, but on the whole, we were seeing good scores."  Documentation submitted by the District

to the IHO indicated that a study of students at a North Carolina school and a Nevada school

demonstrated improvement in students with learning disabilities through use of the Read 180

program.[13]

 The Parents argue the Read 180 program, as proposed by the District, was inadequate

---

[13]  This court notes in response to the Parents' argument that the program chosen for
Casey needed to be "research based," at least one court has stated: "There is no requirement in
the IDEA for use of any particular Reading programs above others, nor is there any precedent for
finding an IEP inappropriate for failing to exclusively use a 'research-based' Reading program."
Robert B. v. West Chester Area Sch. Dist., 2005 WL 2396968, at *8 (E.D. Pa. 2005).  The court
further finds this argument without merit because, as discussed above, research has been
conducted on the Read 180 program and found it to be an effective program.

because it was to be taught in 50 minute class periods rather than the 90 minute class periods recommended in documentation for the Read 180 program. However, the materials regarding the Read 180 program included in the administrative record indicate only that "best results" can be obtained this way. The Parents have failed to present evidence indicating that in a 50 minute class period the Read 180 program would result in Casey failing to receive educational benefits.[14] The Parents also argue the Read 180 program is ineffective because when the observation of the program was conducted, it was taught by Jim Sherer who is not a certified special education teacher. However, at the time of the IEP meeting, Tricia Downs testified that she would teach the Read180 program, and she is certified as a special education teacher. Furthermore, Jim Sherer is endorsed as reading specialist under the standards of the Illinois State Board of Education and has been trained in the Read 180 program.

In addition, based upon this court's review of the record, it does not appear that Casey's progress at Acacia has been remarkable. The IHO heard testimony regarding Casey's progress at Acacia between September 2003 and February 2004 based upon his performance on the Woodcock-Johnson III Achievement Tests. Kathy Foucks, the principal of Acacia, testified that Casey should have theoretically scored much higher in February 2004 than when he started in September 2003. However, the test results do not demonstrate such a substantial improvement. The evaluation

---

[14] Plaintiffs assert that the deposition testimony of Dr. Ted Steven Hasselbring indicates that unsuccessful students among those using the Read 180 program are a result of the failure to follow the 90 minute model. This court has reviewed the portions of the Hasselbring deposition to which Plaintiffs cite and has failed to find this statement. What Hasselbring does state is that "you always look for . . . fidelity in the instructional model" and you "want to make sure there's a 90-minute period that is done every day." Hasselbring does not indicate, however, that the program is ineffective if a 50 minute model is used. Rather he indicates the program "recommends" 90 minutes per day.

completed by the Parents' expert, Jean Kulczyk, does not instruct this court otherwise.  Kulczyk indicated in her report that Casey was frequently off task in class and was not appropriately controlled by staff at Acacia.  Kulczyk further indicated, with regard to the map project she observed in geography class, that the staff did not appropriately modify the project for Casey's difficulty with handwriting.  In describing some of what she observed during her evaluation, Kulczyk stated during her deposition:

> I knew this would not please him [Plaintiffs' counsel] at all.  And when Mrs. [K]
>
> sees it, she's not going to be happy.  But the fact of the matter is, if I don't tell what
>
> I see, I'm not helping this child.

The parties have also presented this court with a battle of the experts regarding the suitability of the Read 180 program for Casey.  Van Acker, the District's expert, has been a professor at the College of Education at the University of Illinois in Chicago since 1987 and was the Special Education Area Chairperson from 1994 to 1998.  Dr. Lorber, the Parents' expert, is a pediatric neuropsychologist and has national board certifications in behavioral psychology and school psychology.  This court has carefully reviewed the reports of both experts who are eminently qualified to offer opinions on this matter and is persuaded by the report of Van Acker.  Van Acker's report indicated that the District's program is appropriate for Casey in that it has a better teacher:pupil ratio and more intensive instruction than that reported at Acacia Academy.  Van Acker further indicated "the level of academic engagement displayed by the students in the special education classes observed . . . was quite impressive."  Dr. Lorber also did an intensive comparative analysis of Casey's scores on several academic tests in both 2003 and 2005.  However, as the parties' briefs clearly evidence, the significance of these test scores can be interpreted in different ways.  The record clearly indicates

-20-

that there is a disagreement between these educational professionals as to the best program for Casey.  In this circumstance, particularly when considering the problems Kulczyk found with the Acacia program, this court does not believe it should substitute its judgment for that of the local educational agency regarding whether the Read 180 program is reasonably calculated to give Casey meaningful educational benefits.

The Parents also assert that the District's proposed ESY, the 20th Century program, was inappropriate.  In the instant case, Casey never participated in the ESY proposed by the District. However, the record indicates that without ESY Casey did not experience any significant regression. In March 2004, he was beginning Book 8 in the Wilson Reading Program and shortly after the beginning of the school year in September 2004 he completed Book 9.  The Parents state in their brief that "[s]ince there was no testing done immediately before and after the summer of 2004, it is unclear how much regression actually occurred" but it is "likely" Casey regressed because he had progressed significantly in his first five months in Acacia.  Such an assertion is too speculative for this court to find that the ESY was inappropriate.

ESY services have "a limited purpose, which is to prevent regression in the summer, not produce significant educational gains." J.P. v. West Clark Cmty. Sch., 230 F. Supp. 2d 910, 940 n. 10 (S.D. Ind. 2002).  The 20th Century program focused on language arts and math with experienced based activities, and offered a literary approach including vocabulary, comprehension and fluency. The District indicated related services consisting of 50 minutes per week of speech/language therapy and 30 minutes per week of occupational therapy could be offered on the fifth day of each week when the 20th Century program was not being used.   Other than the report of Kulczyk which was admitted before the IHO, there is no evidence before this court to indicate this ESY would not

prevent regression for Casey or provide educational benefit.

Furthermore, this court finds the proposal by the District was the LRE.  The IDEA creates a strong preference in favor of "mainstreaming" or insuring that disabled children are educated with nondisabled children to the extent possible.  Board of Educ. of LaGrange Sch. Dist. No. 105 v. Illinois State Bd. of Educ., 184 F.3d 912, 915 (7th Cir. 1999).  The IDEA's implementing regulations indicate that, to the maximum extent possible "children with disabilities, including children in public or private institutions or other care facilities, [should be] educated with children who are nondisabled."  34 C.F.R. § 300.550(b)(1).  Under the District's IEP, Casey would spent 10% of his day with non-disabled peers.  Furthermore, being educated in the District would also allow Casey to socialize with his peers outside of school hours.  Federal regulations indicate that a student should be placed as close as possible to the student's home.  See 34 C.F.R. § 300.552(a)(3).  In the instant case, Mari testified that her travel time to Acacia was 1.5 hours each way.  Casey indicated to Dr. Lorber he would like to return home from school earlier because it is too dark to play with his peers when he gets home.  In Judith S. v. Board of Educ. of Cmty. Unit Sch. Dist No. 200, 1998 WL 409416, at *10 (N.D. Ill. 1998), the court was faced with a similar situation and found the LRE where the student did not have to travel three to four hours per day to get to and from school.[15] Because this court has determined that the District can provide FAPE to Casey, the fact that a placement in the District is also the LRE indicates that it is a more appropriate placement than

_____

[15] The Parents correctly point out that a student should not be placed in a program that does not confer educational benefits simply because it is less restrictive.  See Beth B. v. Van Clay, 282 F.3d 493, 497 (7th Cir. 2002).  However, the court has found that the program proposed by the District would indeed confer educational benefits.  The distance to Acacia merely indicates that it is not the LRE for Casey to receive these educational benefits.

Acacia.[16]

Finally, the Parents have raised in their motion for summary judgment an issue regarding reimbursement for transportation expenses which accrued when the stay put order was in place. The Parents have failed to submit any amounts for which they seek reimbursement, and this court questions whether the present suit is the appropriate avenue to obtain reimbursement for these expenses. However, if the Parents wish to continue to pursue this claim they may file a separate motion setting forth authority for this court to award these expenses in this suit and demonstrating the amounts owed.

IT IS THEREFORE ORDERED:

(1) Defendant's Motion for Summary Judgment (#92) is GRANTED.

(2) Plaintiffs' Motion for Summary Judgment (#98) is DENIED.

(3) Should the Parents wish to pursue their claim for reimbursement for travel expenses which accrued while the stay put order was in place, they may file an appropriate motion within thirty (30) days of entry of this order.

(4) This case is terminated.

ENTERED this 14th day of August, 2006

**s/ Michael P. McCuskey**
MICHAEL P. McCUSKEY
CHIEF U.S. DISTRICT JUDGE

---

[16]  This court notes that counsel for Plaintiffs has raised a myriad of issues in his motion. While this court appreciates counsel's desire to vigorously represent his clients by presenting every argument he feels may be viable, many of the arguments raised by counsel are presented without citation to authority and without adequate analysis. This court declines to address those weaker arguments which should have been winnowed by counsel and were not adequately developed in his filings. See United States v. Boscarino, 437 F.3d 634, 635 (7th Cir. 2006).